## PEOPLE v. PARK.

(Supreme Court, Appellate Division, First Department. April 29, 1901.)

ADULTERATED FOOD—HEALTH LAW—VIOLATION—EVIDENCE.

Public Health Law, § 41, forbids the manufacture and sale of adulterated beverages, and the sale of any inferior or cheaper substance in imitation of, or under the name of, another article. Defendant sold a mixture of 48 per cent. sugar, 35 per cent. tartaric acid, 12 per cent. citric acid, and 5 per cent. the oil of lemon as "Eiffel Tower Lemonade." On the box were pictures of lemons, and each box contained a circular, which stated that 38,000,000 lemons were used last year in manufacturing Eiffel Tower Lemonade, and that it was manufactured by concentrating the lemons in the orchards where they were grown. Defendant testified that the oil of lemon was made from the lemon rind, and that 52,000,000 lemons were used in the last year in manufacturing such lemonade. Tartaric acid is much cheaper than lemon juice. *Held*, that the evidence was sufficient to sustain a verdict finding defendant guilty of selling an inferior article as lemonade.

Appeal from trial term, New York county.

Action by the people of the state of New York against William Park to recover a penalty for a violation of the public health law. From a judgment in favor of plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

Julius M. Mayer, for appellant.
Joseph N. Tuttle, for the People.

O'BRIEN, J. This action was brought to recover a penalty, pursuant to section 41 of the public health law, for a violation of subdivisions 2 and 4 thereof, on the ground "that the defendant, on or about

the 20th day of July, 1900, did have, offer for sale, and sell, at 15 Jay street, * * * a quantity of food or beverage under the name of 'Eiffel Tower Lemonade,' which food or beverage contained no lemon juice, and in which food or beverage inferior and cheaper substances had been wholly substituted for the juice of lemons, and which food or beverage was an imitation of lemonade, and was sold under the name of lemonade." Section 41 of the health law, forbidding the manufacture and sale of adulterated food (including beverage), states, in subdivisions 2 and 4, that adulteration exists "if any inferior or cheaper substance or substances have been substituted wholly or in part for the article," or "if it be in imitation or be sold under the name of another article."

It is conceded that on the 20th day of July, 1900, the defendant sold, at 15 Jay street, an article known as "Eiffel Tower Lemonade"; and we have in evidence an advertising circular respecting such preparation, and also one of the marked boxes in which it was sold. The article purchased, it appears, was a dry granulated mixture of a yellowish color. Both the box and the circular bear pictures of cut lemons, and upon the circular are the words:

"38 Millions of Messina Lemons (the finest lemons the world produces) were used last year in the manufacture of Eiffel Tower Lemonade. It is by concentrating the lemons in the orchards where they are grown that the Eiffel Tower Lemonade can be supplied at this remarkable price. 10 pints for 10c. The Medical Magazine says: The simplicity of this preparation is its great recommendation. In a very short period of time, and with a minimum of trouble, we have before us a delicious drink for summer use. A lemonade as refreshing and pleasant to the most critical taste, and as harmless, as it is possible to obtain. We can cordially commend it to the notice of the medical profession, as well as to the general public."

These latter words appear also upon the box, which further says, "Directions must be followed to make a perfect lemonade;" which directions are: "Place the contents of this bottle in a jug; add ¾ lb. granulated sugar; pour over the whole 1 pint of boiling water; stir till dissolved; when cold it is ready for use. This will make syrup for 10 pints." The plaintiff's chemist testified that the preparation— which he purchased in the rear of the defendant's store, and not at the soda fountain—contained, according to his analysis, about 49 per cent. of tartaric acid, 44 per cent. of cane sugar, 5 per cent. oil of lemon and coloring matter, and 2 per cent. of water; that tartaric acid is a vegetable acid, obtained from the grape, and that the oil of lemon, which was the only product of the lemon found, comes from the yellow portion of the rind of the lemon. The defendant showed that his formula for the mixture was about 48 per cent. sugar, 35 per cent. tartaric acid, 12 per cent. citric acid, and 5 per cent. oil of lemon. It was testified that, although lemon juice contains citric acid, "concentrated lemon juice differs from * * * pure citric acid, in that it contains all the ingredients of the original lemon juice except the water, while citric acid is citric acid alone,—a pure chemical substance." From the testimony of the defendant, it appears that the article in question was manufactured in this city of tartaric acid and citric acid purchased here, and his claim is that the oil of lemon (not the citric acid) came from a place near Messina, Italy, and that it

69 N.Y.S.—71

took over 52,000,000 of lemons to make the oil of lemon required and used in the Eiffel Tower Lemonade for the year past. The defendant's attorney upon the trial attempted to define the word "concentrated" as meaning gathered together, and to show that the lemons were thus "concentrated" in the orchards of Italy. And the claim also was made that the box and circular advertised "a lemonade," not lemonade, and that "a lemonade" could be made with nothing but acids, and no lemons whatever. In connection with this point, the plaintiff gave testimony that tartaric acid was cheaper than citric acid or lemon juice itself.

The appellant's claim is that he did not sell, nor purport to sell, lemonade, but "Eiffel Tower Lemonade," which, as the court charged, was a "distinctive arbitrary name"; that no liquid was sold, and no one could possibly think he was buying ordinary lemonade, but "a lemonade"; and that 38,000,000 of lemons were needed, as matter of fact, in the manufacture of the article, and there was no deception whatever. We think it is evident that the defendant was selling a preparation which the public would, from the advertisements, take to be made from lemons, containing not only a part of the yellow rind, but the juice as well. It was therefore being "sold under the name of another article." Moreover, the evidence shows that tartaric acid, which formed the greater part of the acid used, was a substance cheaper than lemon juice or the acid in lemon juice, so that, under both subdivisions of the law, the defendant was clearly liable for the penalty. It is evident that the word "concentrated" should be taken in its ordinary sense, and, as here applied, was intended to convey the meaning and impression that the lemons were squeezed, and the juice concentrated to form the article sold. In this sense, the preparation was not concentrated lemon juice. We think that there can be no possible escape from the conclusion that the article was held out to the public as made from lemon juice, and that the beverage formed by its admixture with water was lemonade. As neither representation was true, and the product was but an imitation or simulation of lemonade, the verdict is amply sustained. We have examined the exceptions taken to the rulings upon evidence and to the judge's charge, and none of them require discussion. Judgment affirmed, with costs. All concur.